UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Case: 1:24–cv–01175 JURY DEMAND
Assigned To : Lamberth, Royce C.
Assign. Date : 4/19/2024
Description: Gen. Civil (E–DECK)

UNITED STATES OF AMERICA,
ex rel. AIDAN FORSYTH,

24  CV

                                          Plaintiffs,

v.

THE CLUB AT MORNINGSIDE INC,
PORT SUSAN CAMPING CLUB,
WOODHOLME COUNTRY CLUB INC,
SECESSION GOLF CLUB INC, individually,
and as defendant class representatives, et al.,

                                          Defendants.

QUI TAM COMPLAINT
DEMAND FOR JURY TRIAL

Filed under seal pursuant to
31 U.S.C. § 3730(b)(2)

## COMPLAINT AND DEMAND FOR JURY TRIAL

## INTRODUCTION

1.      This is a defendant class-action *qui tam* lawsuit brought against THE CLUB AT

MORNINGSIDE INC, PORT SUSAN CAMPING CLUB, WOODHOLME COUNTRY CLUB

INC, and SECESSION GOLF CLUB INC, individually, and as defendant class-action

representatives ("Class Representatives"), and 64 similarly situated entities whose identities are

listed on Exhibit A to this Complaint, ("Defendants") under the False Claims Act, 31 U.S.C. §

3729, *et seq*. ("FCA" or "Act"), to recover damages and civil penalties on behalf of the United

States of America ("United States").

2.      In addition to damages and civil penalties, relator Aidan Forsyth ("Forsyth" or

"Relator") also seeks to recover on his own behalf the maximum relator's share and attorneys' fees,

expenses, costs, prejudgment interest, and other relief permitted under the FCA.

3.      The FCA *qui tam* allegations in this complaint ("Complaint") arise from

Defendants' misconduct and practices concerning their unlawful receipt and retention of first-draw

Paycheck Protection Program ("PPP") funds from the Small Business Administration ("SBA").

RECEIVED
APR  19  2024
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

4.      Specifically, between March and June 2020, Defendants knowingly submitted, or caused others to submit, PPP loan applications and loan-related information for loans that falsely stated they were eligible PPP borrowers, when in fact, as Defendants well knew, they were so-called "501(c)(7) social clubs," a category of nonprofit organizations that were ineligible for first-draw PPP loans.

5.      Between in or about April and July 2020, Defendants received first-draw PPP funds (each with specifically designated SBA loan numbers).

6.      In 2020 and 2021, Defendants applied for forgiveness of their PPP loans.

7.      Between in or about November 2020 and October 2021, the SBA forgave the principal amount of Defendants' first-draw PPP loans plus accrued interest.

8.      The conduct described above, and alleged elsewhere in this Complaint, violated 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B), and (a)(1)(G).

9.      As a result of Defendants' PPP fraud, the United States suffered substantial economic losses, including, but not limited to the amounts of PPP loan forgiveness and fees paid to the PPP lending banks and institutions, and is entitled to treble damages and maximum civil penalties, the precise amount of which will be determined at trial.

10.     For bringing this action, Relator is entitled to up to 30% of any recovery plus reasonable attorneys' fees, costs and expenses.

## PARTIES, ENTITIES AND PERSONS

### Relator Forsyth

11.     Relator Forsyth is a resident of the State of New York.

### The United States

12.     The United States, acting through the SBA and supported by the U.S. Department of Treasury, is the real party-plaintiff-in-interest in the *qui tam* claims in this action.

13.    The SBA's headquarters is located at 409 Third Street, SW, Washington, D.C. 20416.

14.    The SBA was created in 1953 as an independent agency of the United States government ("Government") to aid, counsel, assist, and protect the interests of small business concerns, to preserve free competitive enterprise, and to maintain and strengthen the overall U.S. economy.

15.    Among other mandates, the SBA assists small businesses in recovering from economic disasters, such as the coronavirus pandemic that adversely affected the U.S. economy beginning in early 2020.

16.    One of the available instruments to the SBA in circumstances like the COVID-19 pandemic is the provision of forgivable low-interest loans to qualified borrowers.

### Defendants

17.    Each Defendant is a private club "organized for pleasure, recreational and other nonprofitable purposes" under Section 501(c)(7) of the Internal Revenue Code ("IRC"), that is, a 501(c)(7) social club.

### Defendant Class Representatives

### The Club at Morningside Inc

18.    The Club at Morningside Inc ("Morningside") was formed in or about 1982.

19.    Morningside is located at 39033 Morningside Dr., Racho Mirage, CA 92270.

20.    Morningside's primary phone number is (760) 324-1234.

21.    Morningside's website URL is www.clubatmorningside.com.

22.    Morningside's federal employer identification number ("EIN") is 95-3751854.

23.    According to its 2020 IRS tax filing ("Form 990"), Morningside had gross receipts of $9,430,587, net assets of $8,135,455 and employed 155 people.

24.    Morningside's Form 990 further indicates that it has "Tax-exempt status" under "501(c)(7)."

25.    G. Harrison, Morningside's Chief Operating Officer, signed its 2020 Form 990.

26.    Morningside is registered with the California Secretary of State as a domestic Nonprofit Corporation –CA—Mutual Benefit, Secretary of State ID number 1066260.

27.    Prior to 6/11/2020, Morningside submitted a PPP loan application to WebBank in the State of Utah.

28.    Its application falsely indicated that Morningside was an "LLC" (i.e., limited liability company).

29.    On or about 6/11/2020, Morningside's PPP loan application was approved in the amount of $727,427.00, ("SBA Loan No. 2387737908").

30.    Prior to 7/6/2021, Morningside submitted a PPP loan forgiveness request to WebBank.

31.    On or about 7/6/2021, Morningside's request for PPP loan and interest forgiveness was granted in the aggregate amount of $735,145.51.

32.    Morningside has not refunded to the SBA the amount forgiven on SBA Loan No. 2387737908.

### Port Susan Camping Club

33.    Port Susan Camping Club ("Port Susan") was formed in or about 1977.

34.    Port Susan is located at 12015 Marine Drive, Tulalip, Washington 98271.

35.     Port Susan's primary phone number is (360) 652-7520.

36.    Port Susan's website URL is www. portsusancamping.com.

37.    Port Susan's federal employer identification number ("EIN") is 91-1089047.

38.    According to its 2020 IRS tax filing ("Form 990"), Port Susan had gross receipts of $4,962,044, net assets of $9,142,274 and employed 102 people.

39.    Port Susan's Form 990 further indicates that it has "Tax-exempt status" under "501(c)(7)."

40.    Dean Hunter, Port Susan's Director, signed its 2020 Form 990.

41.    Port Susan is registered with the Washington Secretary of State as a domestic nonprofit corporation, Secretary of State ID number 604 500 855.

42.    Prior to 5/15/2020, Port Susan submitted a PPP loan application to Kabbage, Inc. in the State of Georgia.

43.    Its application falsely stated that Port Susan was a "C-Corp" (i.e., for profit corporation).

44.    On or about 5/15/2020, Port Susan's PPP loan application was approved in the amount of $722,415.00, ("SBA Loan No. 7014267408").

45.    Prior to 10/6/2021, Port Susan submitted a PPP loan forgiveness request to Kabbage Inc.

46.    On or about 10/6/2021, Port Susan's request for PPP loan and interest forgiveness was granted in the aggregate amount of $732,350.68.

47.    Port Susan has not refunded to the SBA the amount forgiven on SBA Loan No. 7014267408.

**Woodholme Country Club Incorporated**

48.    Woodholme Country Club Incorporate ("Woodholme") was formed in or about 1927.

49.    Woodholme is located at 300 Woodholme Avenue, Pikesville, Maryland 21208.

50.      Woodholme's primary phone number is (410) 486-3700.

51.      Woodholme's website URL is www.woodholme.org.

52.      Woodholme's federal employer identification number ("EIN") is 52-0535530.

53.      According to its 2020 IRS tax filing ("Form 990"), Woodholme had receipts of $5,849,378, net assets of -$2,330,764 and employed 160 people.

54.      Woodholme's Form 990 further indicates that it has "Tax-exempt status" under "501(c)(7)."

55.      Christopher Murry, Woodholme's General Manager, signed its 2020 Form 990.

56.      Woodholme is registered with the Maryland Secretary of State as a non-stock (i.e., non-profit) corporation, Secretary of State ID number D00247940.

57.      Prior to 5/1/2020, Woodholme submitted a PPP loan application to The Harbor of Maryland in the State of Maryland.

58.      Its application falsely stated that Woodholme was a "C-Corp" (i.e., for profit corporation).

59.      On or about 5/1/2020, Woodholme's PPP loan application was approved in the amount of $695,000.00, ("SBA Loan No. 8366317310").

60.      Prior to 1/20/2021, Woodholme submitted a PPP loan forgiveness request to The Harbor Bank of Maryland.

61.      On or about 1/20/2021, Woodholme's request for PPP loan and interest forgiveness was granted in the aggregate amount of $699,710.56.

62.      Woodholme has not refunded to the SBA the amount forgiven on SBA Loan No. 8366317310.

## Secession Golf Club Inc

63.    Secession Golf Club Inc ("Secession") was formed in or about 2007.

64.    Secession is located at 142 Secession Drive, Beaufort, South Carolina 299076.

65.    Secession's primary phone number is (843) 522-4600.

66.    Secession's website URL is www.secessiongolf.com.

67.    Secession's federal employer identification number ("EIN") is 26-0178692.

68.    According to its 2020 IRS tax filing ("Form 990"), Secession had receipts of $6,963,315, net assets of $10,543,855 and employed 132 people.

69.    Secession's Form 990 further indicates that it has "Tax-exempt status" under "501(c)(7)."

70.    Darrin Helfrick, Secession's General Manager, signed its 2020 Form 990.

71.    Secession is registered with the South Carolina Secretary of State as a Domestic Nonprofit Corporation, Secretary of State ID number 00798124.

72.    Prior to 4/11/2020, Secession submitted a PPP loan application to Palmetto State Bank in the State of South Carolina.

73.    Its application falsely stated that Secession was a "C-Corp" (i.e., for profit corporation).

74.    On or about 4/11/2020, Secession's PPP loan application was approved in the amount of $630,750.00, ("SBA Loan No. 3015057103").

75.    Prior to 2/18/2021, Secession submitted a PPP loan forgiveness request to Palmetto State Bank.

76.    On or about 2/18/2021, Secession's request for PPP loan and interest forgiveness was granted in the aggregate amount of $636,072.49.

77.     Secession has not refunded to the SBA the amount forgiven on SBA Loan No. 3015057103.

### Non-Party PPP Lenders

78.     The SBA contracted with numerous banks and other financial institutions to serve as PPP loan processors, underwriters, and lenders during 2020 and 2021.

79.     Defendants submitted, or caused others to submit, Defendants' first-draw PPP loan application and loan-related information, including their requests for SBA forgiveness of their PPP loan obligations including accrued interest, to the respective SBA-approved PPP lending banks and financial institutions listed on Exhibit A (the "Lenders").

80.     The SBA paid the Lenders fees for processing PPP first-draw loan applications and forgiveness requests.

### Defendant Class Action Allegations

81.     Relator brings this lawsuit as a defendant class action pursuant to Federal Rules of Civil Procedure 23d(a) and (b)(1)(A) and (B) against a class of entities that wrongfully and unlawfully obtained first-draw PPP loans and forgiveness between 2020 and 2021 because they were 501(c)(7) social clubs and thus ineligible PPP participants under clearly defined and widely publicized SBA laws, regulations, rules and policies.

82.     The members of this class are so numerous that joinder of all members is impracticable. There are 67 such members listed on Exhibit A. This list is not inclusive of all 501(c)(7) social clubs that wrongfully and unlawfully applied for first-draw PPP loans in 2020 and 2021.

83.     There are questions of law and fact that are common to all members of the class, including, but not limited to, questions of law concerning falsity, materiality, scienter, overpayments under the FCA as applied to the PPP, and questions of fact concerning the means,

manner and process by which the class members applied for and obtained PPP loan proceeds and forgiveness.

84.     The nature of the defenses that are likely to be asserted by the Class Representatives are likely to be the same as, or substantially similar to, the defenses asserted by all members of the class.

85.     The Class Representatives are typical of all class members and will be adequate and appropriate representatives of the class because they have the same incentive to vigorously defend the allegations in this Complaint as do all members of the class and none of the Class Representatives is likely to have any conflicts of interests with any other members of the class.

86.     Prosecuting separate actions against each class member would create the risk of inconsistent judgments with respect to the individual class members, particularly as to the central legal questions concerning falsity, materiality and scienter under the FCA, as applied in the context of first-draw PPP loans to ineligible 501(c)(7) social clubs.

87.     Further, as a practical matter, the cost and difficulty of prosecuting separate actions against each class member justify class certification here, so too does the risk that separate adjudications of common questions of law and fact related to the allegations in this Complaint may be dispositive of and/or substantially impair the interests of the named non-representative defendants on Exhibit A, as well as other, unnamed class members.

88.     By virtue of their participation in SBA's PPP, all class members are subject to personal jurisdiction in the United States District Court for the District of Columbia.

89.     Additionally, the non-representative defendants on Exhibit A can always seek to join this action if they want to defend allegations against them specifically.

## JURISDICTION AND VENUE

90.     This Court has original subject matter jurisdiction over the FCA *qui tam* claims alleged in this Complaint under 28 U.S.C. § 1331 (federal question) and 31 U.S.C. § 3732(a) (False Claims Act).

91.     This Court has personal jurisdiction over Defendants under 31 U.S.C. § 3732(a) because Defendants can be found, reside, or transact business in this district. Section 3732(a) of the FCA further provides for service of process at any place within or outside the United States.

92.     Venue is proper in this district under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because Defendants can be found, reside, and transact business in this district; acts proscribed by 31 U.S.C. § 3729 occurred within this district; or a substantial part of the events or omissions giving rise to the *qui tam* claims alleged in this Complaint occurred in this district.

## FCA SUBJECT MATTER JURISDICTION

93.     Relator brings this *qui tam* action pursuant to 31 U.S.C. 3730(b).

94.     Upon information and belief, none of the subject matter or other jurisdictional bars, preclusions, restrictions, or limitations set forth in Section 3730 of the FCA is applicable to this action.

## LIABILITY, DAMAGES AND AWARDS UNDER THE FCA

95.     The FCA imposes civil liability on "any person" who, among other things:

    (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement

material to an obligation to pay or transmit money or property to the Government,

or knowingly conceals or knowingly and improperly avoids or decreases an

obligation to pay or transmit money or property to the Government.

31 U.S.C. §§ 3729(a)(1)(A), (B) and (G).

96.    Section 3729(b)(1) of the Act defines the terms "knowing" and "knowingly" to

(A) mean that a person, with respect to information—

(i) has actual knowledge of the information;
(ii) acts in deliberate ignorance of the truth or falsity of the information; or
(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b)(1).

97.    Section 3729(b)(2) of the Act defines "claim" to mean any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States, or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded, or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. 31 U.S.C. § 3729(b)(2)(A) (as amended May 20, 2009; the prior version is materially identical for purposes of this action).

98.     Section 3729(b)(3) of the Act defines the term "obligation" to mean an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment.

99.     Section 3729(b)(4) of the Act defines the term "material" to mean having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

100.    Section 3729(a) of the Act provides that any person who knowingly violates the FCA is liable to the United States for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461, Public Law 104-410), which currently sets the minimum penalty at $13,508 and the maximum penalty at $27,018, plus three times the amount of damages the Government sustains because of an act of that person.

101.    Section 3730(d) of the Act provides that where the Government intervenes in and proceeds with an action commenced by the filing of a *qui tam* complaint pursuant to 31 U.S.C. § 3730(b), and recovers money or property from a defendant under Section 3729, the person who initiated the action (known as the "relator"), shall receive between fifteen percent (15%) and twenty-five percent (25%) of the proceeds, subject to certain exceptions and limitations, none of which applies here.

102.    Where the Government does not intervene in the *qui tam* action and the relator pursues it without the Government's involvement and recovers proceeds from a defendant under Section 3729, the relator, again, subject to certain exceptions and limitations that do not apply here, shall receive between twenty-five percent (25%) and thirty percent (30 %) of the proceeds. 31 U.S.C. § 3730(b).

103.     Whether the Government intervenes in the matter or not, the relator in a successful *qui tam* action is also entitled to an award against the defendant for the amount of all reasonable expenses, attorneys' fees, and costs incurred in pursuing the *qui tam* claims. *Id*.

### FCA'S STATUTE OF LIMITATIONS

104.     A *qui tam* claim under section 3730(b) of the FCA may not be brought (1) more than 6 years after the date on which the violation of section 3729 is committed, or (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last. 31 U.S.C. § 3731(b).

### PPP LAWS, REGULATIONS, RULES AND FORMS

105.     Congress authorized the Paycheck Protection Program in the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, P.L. 116-136, in or about March 2020.

106.     The program was intended to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic through forgivable loans to small businesses for job retention and other specified expenses.

107.     The two most favorable aspects of the loans were a low interest rate (namely, 1%) and the opportunity to have the loan's principal and accrued interest completely forgiven if certain specified conditions were met.

108.     Congress made PPP loans available in two separate rounds or "draws."

109.     The first-draw application period began in or about March 2020 and ended in or about May 2020.

110.     The application period for the second draw, which was for certain eligible first-draw borrowers, began in or about January 2021 and ended in or about March 2021.

111.    In total, PPP borrowers received approximately $815 billion in low-interest and potentially forgivable loans.

## IRC 501(c)(7) Social Clubs

112.    Section 1102 of the CARES Act defines the term "nonprofit organization" as "an organization that is described in section 501(c)(3) of the Internal Revenue Code of 1986 and that is exempt from taxation under section 501(a) of such Code."

113.    Section 501 of the IRC provides that certain types of organizations are exempt from federal taxation.

114.    Subsection 501(c) lists the various types of tax-exempt organizations.

115.    Subsection 501(c)(7) provides that "Clubs organized for pleasure, recreation, and other nonprofitable purposes, substantially all of the activities of which are for such purposes and no part of the net earnings of which inures to the benefit of any private shareholder" are tax-exempt.

116.    Subsection 501(c)(7) organizations are often referred to as "social clubs."

## FIRST DRAW PPP LOANS

117.    Congress originally authorized approximately $349 billion in PPP funds in March 2020 under the SBA's Section 7(a) Loan Program. In April 2020, Congress authorized an additional estimated $300 billion in PPP funds.

118.    Between approximately April 3, 2020, and August 8, 2020, the SBA made roughly 5.2 million PPP loans.

119.    Approximately 660,000 applicants received between $150,000 and $10 million in PPP funds.

120.    Because of the overwhelming need to disburse financial relief as quickly as possible to small businesses during the early stages of the coronavirus pandemic, the SBA did not require stringent lending oversight on individual PPP loan applications requesting less than $2 million.

121.    The SBA effectively created an "honor system" among the applicants, the lenders, and the SBA.

122.    The SBA's Office of Inspector General ("OIG") has since publicly acknowledged there was massive fraud in the applications for, and receipt of, PPP funds.

123.    PPP rules required the funds for first-draw loans to be expended solely on "authorized purposes," also referred to as, "allowable uses" or "permissible expenses"; "authorized purposes" included payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities.

124.    PPP rules defined "payroll costs" to include wages, salaries, tips, and commissions, as well as certain non-cash employment benefits: employer contributions to defined-benefit or defined-contribution retirement plans; payment for the provision of group health care coverage, including insurance premiums; payment of state and local taxes assessed on employee compensation; and costs for employee vacation, parental, family, medical, and sick leave.

125.    The CARES Act excluded from the definition of "payroll costs" for PPP loan application purposes any employee compensation in excess of an annual salary of $100,000.

126.    PPP rules and regulations also precluded a borrower from including as payroll costs payments made to self-employed, independent contractors ("1099 Employees") and to persons not residing in the United States.

127.    To be a qualified borrower for PPP purposes, a small business (or nonprofit organization) had to be in existence on February 15, 2020, and have employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on IRS Forms 1099-MISC.

128.    The borrower could be an independent contractor, eligible self-employed individual, sole proprietorship, or organization employing no more than 500 employees (with certain exceptions allowing a greater number).

129.    Only two types of nonprofit organizations were eligible for first-draw PPP funds: Section 501(c)(3) and Section 501(c)(19) entities. The former covers religious, charitable, scientific, literary, and educational organizations. The latter covers veterans' organizations.

130.    Other types of nonprofit organizations, including those operating with Section 501(c)(7) tax-exempt status—i.e., social clubs like RRC—were excluded from PPP first-draw eligibility.

## SBA Form 2483

131.    To obtain PPP funding, the eligible and qualified borrower had to prepare and submit to a participating lender an SBA PPP loan application form ("Form 2483"), signed by the borrower or an agent or representative, as well as certain supporting documentation and information.

132.    Form 2483 was revised a number of times. The original version was dated 04/20.

133.    The first entry on the original Form 2483 directed the applicant to "Check One" and then listed the following types of entities or businesses next to corresponding boxes: Sole proprietor, Partnership, C-Corp, S-Corp, LLC, Independent contractor, Eligible self-employed individual, 501(c)(3) nonprofit, 501(c)(19) veterans organization, Tribal business (sec. 31(b)(2)(C) of Small Business Act), and Other. There was no option for a 501(c)(7) social club.

134.    Form 2483 also called upon the applicant to identify, among other things, the borrower's "Legal Business Name," "Business Address," "Business Phone," "Primary Contact," and "Email Address."

135.    Form 2483 further required the borrower to specify, among other details, its: (a) "Average Monthly Payroll" and (b) "Number of Employees.

136.    Under PPP rules, the Average Monthly Payroll and Number of Employees figures were used to set the maximum amount of funds the borrower was eligible to receive.

137.    That maximum sum was calculated as the borrower's Average Monthly Payroll during a prescribed period multiplied by 2.5, with certain adjustments if the borrower had received an SBA Economic Injury Disaster Loan ("EIDL").

138.    The average monthly payroll cost was derived by aggregating allowable payroll costs from the prior twelve months (with certain exceptions) for employees whose principal place of residence was the United States and subtracting compensation paid to any employee in excess of an annual salary of $100,000. That figure was then divided by twelve to arrive at the average monthly payroll cost. Regardless of the borrower's actual calculated average monthly payroll, the maximum PPP for any single borrower loan could not exceed $10 million.

139.    Form 2483 further required applicants to specify the purpose of the loan, namely, "Payroll," "Lease/Mortgage Interest," "Utilities," or "Other," the last of which required the applicant to "explain."

140.    Form 2483 also required the borrower to affirm, among other things, having read and understood Form 2483 and the borrower's eligibility to receive a PPP loan under the SBA rules in effect at the time the application was submitted.

141.    Form 2483 required the borrower to certify that:

> The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the [various PPP and CARE Acts and program rules].

142.    Form 2483 required the borrower to certify (by initialing) that:

All SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule.

143. Form 2483 required the borrower to certify (by initialing) that:

Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.

144. Form 2483 required the borrower to certify (by initialing) that:

The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule. I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.

145. Form 2483 required the borrower to certify (by initialing) that:

I understand that loan forgiveness will be provided for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities, and not more than 25% of the forgiven amount may be for non-payroll costs.

146. Form 2483 required the borrower to certify (by initialing) that:

During the period beginning on February 15, 2020, and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program.

147. Form 2483 required the borrower to certify as follows:

I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

## PPP Loan Application Processing

148.    First-draw PPP loans were processed by SBA-authorized participating lenders.

149.    To obtain the requested loan amount, prospective borrowers were required to provide the lenders, among other things, the Form 2483 and supporting loan application documentation, such as IRS or state revenue department forms showing periodic employment and unemployment tax information for the borrower, such as IRS Forms 940 (Employer's Annual Federal Unemployment ("FUTA") Tax Return), 941 (Employer's Quarterly Federal Tax Return), W-2 (Wage and Tax Statement), and W-3 (Transmittal of Wage and Tax Statements) for the employees the borrower was claiming.

150.    Where the PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which the SBA guaranteed 100%.

151.    At or about the time PPP loans were approved, the lenders conveyed the borrowers' loan application information to the SBA.

## PPP Loan Forgiveness

152.    The PPP rules as finally implemented required, for loan forgiveness purposes, that the PPP funds be expended for authorized purposes during the 24-week period following receipt of the loan proceeds and that at least 60% of the loan proceeds were used for covered payroll expenses.

153.    Approved borrowers seeking forgiveness were required by the terms of Form 2483 to provide the lenders with documentation verifying the number of full-time equivalent employees on the borrower's payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the 24-week period following receipt of the loan proceeds.

## SBA Form 3508

154.    To obtain PPP loan forgiveness borrowers had to submit an SBA Form 3508 to the

lender according to the instructions set out in SBA Form 3508EZ.

155.    Form 3508 required the borrower to certify that:

> The dollar amount for which forgiveness is requested: was used to pay costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; or business utility payments); . . .

> I understand that if the funds were knowingly used for unauthorized purposes, the federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges.

> The information provided in this application and the information provided in all supporting documents and forms is true and correct in all material respects. I understand that knowingly making a false statement to obtain forgiveness of an SBA-guaranteed loan is punishable under the law, including 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a Federally insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

## SBA PPP REGULATIONS PRECLUDING SOCIAL CLUBS

156.    The CARES Act and SBA regulations in effect at the time of Defendants' applications for and receipt of PPP funds precluded 501(c)(7) social clubs from participating in the PPP program. See 85 Fed. Reg. 20812, SBA Interim Final Rule, effective April 15, 2020 (applicable to first-draw loans submitted prior to June 30, 2020), Section III(2)(i)(B) (stating that PPP eligibility is limited to nonprofits formed under sections 501(c)(3) and 501(c)(19) of the IRC).

157.    Additionally, SBA regulations excluded "[p]rivate clubs and businesses which limit the number of memberships for reasons other than capacity" from all SBA loan programs, including the PPP program. See 13 CFR 120.110(i).

## PPP FAQ RESOURCES RE NONPROFIT ORGANIZATIONS

158.    In addition to promulgating and publishing PPP rules and regulations, the SBA also disseminated to the general public, including via the Internet, Paycheck Protection Program Loans, Frequently Asked Questions (FAQs), that provided summaries and explanations of the program's requirements for both round one and round two loans.

159.    PAYCHECK PROTECTION PROGRAM LOANS, Frequently Asked Questions (FAQs), As of April 6, 2020, Question/Answer #3, explains that 501(c)(3) and 501(c)(19) entities are the only types of nonprofit organizations eligible for first-draw PPP loans.

## COMMON FACTUAL ALLEGATIONS CONCERNING DEFENDANTS' PPP FRAUD

160.    The factual allegations in this Complaint are made upon information and belief because Relator does not have, and cannot presently obtain, Defendants' loan applications, forgiveness forms, and related information and materials, however, these allegations are based on publicly available documents that support them, including, government databases for PPP loan participants and IRS non-profit organizations. Allegations concerning scienter are reasonable inferences from such information.

161.    Between in or about March and June 2020, Defendants submitted Forms 2483 to PPP Lenders for first-draw PPP loans.

162.    Defendants' Forms 2483 classified each of them as one of the following types of entities: cooperative, corporation, limited liability company, non-profit organization, partnership, and professional association. None of the forms identified the borrowers as 501(c)(7) organizations.

163.    Defendants' Forms 2483 further certified that there were eligible PPP borrowers.

164.    In fact, at the time of their PPP loan applications, Defendants were 501(c)(7) tax-exempt social clubs, and, as such, were not eligible PPP borrowers.

165.    Defendants knew they were 501(c)(7) nonprofit organizations at the time they submitted the Forms 2483 to their respective PPP Lenders.

166.    Between in or about April and July 2020, the Lenders, acting on behalf of the SBA, approved Defendants' PPP loan applications.

167.    Shortly thereafter, Defendants received PPP first-draw loan proceeds.

168.    During 2020 and 2021, Defendants submitted Forms 3508 to their respective PPP Lenders seeking complete forgiveness of their PPP loan obligations plus accrued interest.

169.    From in or about November 2020 to October 2021, the SBA forgave the principal and accrued interest on Defendants' PPP loans.

170.    SBA rules in effect at the time that Defendants' PPP loans were forgiven precluded 501(c)(7) social clubs from lawfully receiving and retaining first-draw PPP loan proceeds.

171.    Defendants have not refunded the amounts forgiven by the SBA under the PPP.

172.    Defendants' failure to return wrongfully obtained PPP loan proceeds is being done knowingly.

173.    During 2020 and 2021 the SBA paid loan fees to the Lenders for processing the Defendants' first-draw loan applications and forgiveness requests.

**COMMON FACTUAL ALLEGATIONS CONCERNING MATERIALITY**

174.    Upon information and belief, prior to receiving notice of Relator's allegations, the United States was unaware of the false and fraudulent Form 2483 Defendants submitted, or caused others to submit, to North State Bank and the SBA.

175.    Upon information and belief, a PPP borrower's response to the threshold directive on Form 2483 to indicate the borrower's type of business or organizational status was material to the SBA's decisions to make PPP funds available to borrowers and to forgive their PPP loans, generally.

176.    Not truthfully and accurately disclosing a borrower's status as a 501(c)(7) social club in a first-draw PPP loan was material to the SBA's PPP loan and forgiveness decision-making process, specifically. See Press Release, Department of Justice, Michigan Nonprofit Organizations Agree to Pay $225,887 to Settle False Claims Act Allegations Relating to Improper Receipt of Paycheck Protection Program Loans (Mar. 13, 2023), https://www.justice.gov/opa/pr/michigan-nonprofit-organizations-agree-pay-225887-settle-false-claims-act-allegations (announcing settlement of False Claims Act allegations against two 501(c)(9) nonprofits that improperly applied for first-draw PPP loans when they were ineligible borrowers under the program rules).

177.    It was only after March 11, 2021, that the American Rescue Plan Act was signed into law and, among other things, expanded the categories of eligible PPP borrowers to include additional 501(c) organizations, such as 501(c)(7) social clubs.

## COMMON FACTUAL ALLEGATIONS CONCERNING SCIENTER

178.    The PPP laws, rules, regulations, and forms relevant to this action are clear and unambiguous, including SBA Form 2483, which has a simple box to check for the borrower's organizational or business type.

179.    SBA published clear and authoritative guidance on how to lawfully apply for PPP loans and forgiveness, including a FAQ section on the SBA's website that answered questions concerning what types of organizations were eligible for first-draw PPP loans.

180.    Widely disseminated trade publications and websites covering the 501(c)(7) social club industry repeatedly advised such clubs that they were not eligible for first-draw PPP loans.

181.    Numerous law firms and accounting firms posted information on the internet explaining that 501(c)(7) organizations were ineligible for first-round PPP loans.

182.    Lobbyists acting on behalf of the 501(c)(7) club industry, including the National Club Association, publicly advocated for a change in the rules and regulations precluding their constituents' participation in the first-draw PPP loan program.

183.    Defendants" business registrations filed with their respective Secretaries of State stated that they were Domestic Nonprofit Corporations.

184.    Defendants' Forms 990, including the Forms 990 filed for Tax Year 2020, stated that Defendants had "tax exempt status" under "501(c)(7)."

## CLAIMS FOR RELIEF

## COUNT I

### As to All Defendants

### Violation of 31 U.S.C. § 3729(a)(1)(A)  (False or Fraudulent Claims)

185.    Relator realleges and incorporates all allegations in this Complaint as though fully set forth herein.

186.    The FCA imposes liability on any person who, among other things, knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

187.    Through the acts described above, and otherwise, Defendants, by and through their employees, agents, and representatives, knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, presented, or caused to be presented, to an SBA-authorized PPP lender and to an officer or employee of the SBA, a false or fraudulent Forms 2483 and 3508 and related loan materials and information, all in violation of 31 U.S.C. § 3729(a)(1)(A).

188.    As a result of the foregoing activities, the United States suffered economic damages.

## COUNT II

### As to All Defendants

### Violation of 31 U.S.C. § 3729(a)(1)(B)  (False Records or Statements)

189.    Relator realleges and incorporates all allegations in this Complaint as though fully set forth herein.

190.    The FCA imposes liability on any person who, among other things, knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

191.    Through the acts described above and otherwise, Defendants, by and through their employees, agents, and representatives, knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, used or caused to be made or used a false record or statement material to a false or fraudulent claim, namely by making and submitting the above-described Forms 2483 and 3508 and supporting loan documentation to an SBA-authorized PPP lender and to the SBA, all in violation of 31 U.S.C. § 3729(a)(1)(B).

192.    As a result of the foregoing activities, the United States suffered economic damages.

## COUNT III

### As to All Defendants

### Violation of 31 U.S.C. § 3729(a)(1)(G)  (Wrongful Retention)

193.    Relator realleges and incorporates all allegations in this Complaint as though fully set forth herein.

194.    The FCA imposes liability on any person who knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or

decreases an obligation to pay or transmit money or property to the Government. 31 U.S.C. § 3729(a)(1)(G).

195.    Through the acts described above, and otherwise, Defendants, by and through their employees, agents, and representatives, knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, wrongfully retained overpayments on their PPP loans by obtaining SBA forgiveness of the principal amount and accrued interest, all in violation of 31 U.S.C. § 3729(a)(1)(G).

196.    As a result of the foregoing activities, the United States suffered economic damages.

## PRAYER FOR RELIEF

WHEREFORE, pursuant to 31 U.S.C. § 3730(b), acting on behalf of, and in the name of, the United States and on his own behalf, Relator demands and prays that judgment be entered in favor of the United States and Relator and against Defendants as follows:

### As to Counts I, II and III

1.    On behalf of the United States, for:

   a.    Treble the amount of the United States' damages, plus the maximum statutory penalties for each false claim or false statement;

   b.    All costs of this civil action; and

   c.    Prejudgment interest.

2.    And further, on his own behalf, Relator demands and prays that an award be made in his favor for:

        d.      25 percent (25%) of any recovery by the United States if it intervenes in and conducts this action, or 30 percent (30%) of any recovery if the United States does not intervene;

        e.      An amount for reasonable expenses necessarily incurred by Relator in prosecution of these claims and all reasonable attorneys' fees, expenses, and costs incurred by Relator in pursuing these claims; and

        f.      Such other and further relief to which this Court determines Relator is entitled.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Relator demands that this case be tried before a jury.

Respectfully submitted this 19th day of April 2024.

**COHEN SEGLIAS PALLAS GREENHALL & FURMAN PC**

By: */s/ Julie A. Grohovsky*
Julie A. Grohovsky (D.C. Bar # 412 566)
900 Seventh Street, NW
Suite 725
Washington, D.C. 20001
Tel: (202) 466-4110
Email: jgrohovsky@cohenseglias.com

Sydney Smith Forquer (DC Bar #1671386)
900 Seventh Street NW
Suite 725
Washington, DC 20001
Tel: (202) 466-4110
Email: ssforquer@cohenseglias.com

## MCINNIS LAW

By: */s/ Timothy McInnis*
Timothy J. McInnis, Esq. [7151]
N.Y. State Bar No. 2205086
521 5th Avenue, 17th Floor
New York, NY 10175-0038
Tel. (212) 292-4573
Fax (212) 292-4574
tmcinnis@mcinnis-law.com
        (pro hac vice to be applied for)

*Attorneys for Relator*